IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,992

In the Matter of MICHAEL J. STUDTMANN,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed October 12, 2018. Published censure.

*Stanton A. Hazlett*, Disciplinary Administrator, argued the cause, and *Deborah L. Hughes*, Deputy Disciplinary Administrator, was on the formal complaint for the petitioner.

*G. Craig Robinson*, of Wichita, argued the cause, and *Michael J. Studtmann*, respondent, argued the cause pro se.

PER CURIAM:  This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Michael J. Studtmann, of Wichita, an attorney admitted to the practice of law in Kansas in 1985.

On November 22, 2016, the office of the Disciplinary Administrator filed a motion to continue the formal hearing. The motion was granted by an order filed November 29, 2016. On July 21, 2017, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent and the office of the Disciplinary Administrator filed stipulations on August 16, 2017. The respondent filed an answer on August 17, 2017, an amended answer on September 5, 2017, and a proposed probation plan on October 20, 2017. The respondent and the office of the Disciplinary Administrator filed a second set of stipulations on November 2, 2017. A hearing was held on the complaint before a panel

1

of the Kansas Board for Discipline of Attorneys on November 2, 2017, where the respondent was personally present and was represented by counsel. The hearing panel determined that respondent violated KRPC 1.2(c) (2018 Kan. S. Ct. R. 290) (scope of representation); 1.5 (2018 Kan. S. Ct. R. 294) (fees); 1.7(a) (2018 Kan. S. Ct. R. 302) (conflict of interest); 1.8(f) (2018 Kan. S. Ct. R. 309) (accepting compensation for representation of client from one other than client); and 1.16(d) (2018 Kan. S. Ct. R. 333) (termination of representation).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"12.    This complaint arose out of the respondent's representation of H.S. and T.C. in a criminal matter involving a fatality automobile accident in July 2015. The respondent's representation began on July 23, 2015, and ended on July 29, 2015.

"13.    On Saturday, July 18, 2015, a pedestrian was killed in . . . a hit-and-run accident in Ellis County, Kansas. The Ellis County Sheriff's Department quickly determined that the pedestrian was hit by a newer-model Dodge Ram pickup truck. That evening, the Ellis County Sheriff's Department issued a press release seeking the public's help in locating the Dodge Ram pickup and the missing driver.

"14.    On Sunday, July 19, 2015, an Ellis County Sheriff's Officer contacted T.C. at his residence to determine whether his white 2014 Dodge Ram pickup truck had damage consistent with the accident scene. T.C. told the officer that his pickup truck was located at a well site in Rawlins County, Kansas, and gave the officer a description of the

2

location of the truck. The officer contacted the Rawlins County Sheriff's Department and asked them to locate the vehicle.

"15.    After an extensive search, the Rawlins County Sheriff's Department was unable to find the truck.

"16.    Ellis County Sheriff's Detective Bradley Ricke then made several unsuccessful attempts to contact T.C. by phone and by stopping [by] his residence.

"17.    At 9:00 a.m. on July 23, 2015, Detective Ricke contacted T.C.'s girlfriend, H.S., at Lewis Chrysler Dodge Jeep Ram of Hays, where she worked. The detective explained to H.S. how important it was that he find T.C. in order to locate his 2014 Ram pickup truck.

"18.    After stepping outside to talk with the detective, H.S. told the detective that she had been driving T.C.'s pickup truck and she struck the pedestrian. H.S. told the detective the truck was at a friend's house in Broomfield, Colorado.

"19.    T.C.'s pickup truck was located parked outside a residence in Broomfield, Colorado. Although it had been recently repaired, it was clear the truck had sustained damage consistent with the circumstances of the hit-and-run accident.

"20.    H.S. called T.C. that morning and told him she was about to be arrested. H.S. was arrested and taken into custody that morning. T.C. remained under investigation, too.

"21.    T.C. looked online for an attorney and located the respondent's website. T.C. called the respondent. During his conversation with the respondent, T.C. told him he was working out-of-town and he was concerned that he would be arrested when he got back to Hays. T.C. told the respondent that he wanted to retain counsel before he got back to town. The respondent agreed to represent both H.S. and T.C. The respondent did not discuss with T.C. the potential for a conflict of interest by representing both H.S. and T.C. Additionally, the respondent did not discuss the issues of client confidentiality and

3

attorney-client privilege with H.S. and T.C. if he were to represent both of them. The respondent did not obtain informed consent, confirmed in writing from H.S. and T.C. regarding issues of conflict of interest or confidentiality.

"22.     On July 23, 2015, the respondent wrote to the Ellis County Attorney informing him that he would be representing H.S. The respondent faxed a second letter to the Ellis County Attorney informing the county attorney that the respondent would also be 'assisting [T.C.] regarding any questions involving this accident on July 18, 2015.'

"23.     The respondent then sent a letter to H.S. *via* fax to the Ellis County Jail. In that letter the respondent stated:

'Dear [H.S.]:

'I just visited with you by phone and I will be representing you on the charges that are filed by the Ellis County attorney. The judge will set a bond in your case and it's been my understanding that that information is often available by 4 PM as of today's date. There will be a first appearance in front of the District Court Judge once the complaint is filed with the court. I do not know when the first appearance will be but these will be things we will find out very soon.

. . . .

'What happens when you have an attorney is that all the legal matters that pertain to this case will go through my office. We will communicate with you as this is your case that involves your life and it's my job [to] be your advocate at all times. We don't take action unless we first get your permission. What I'm specifically doing at this time is attempting to find out when they anticipate charges being filed and there will be a first appearance set. However, before that occurs they will have a bond set and I want to see if this is an affordable bond or if we need to seek a possible reduction. Sometimes I can do that by an agreement with the

4

County attorney and the Judge. Sometimes there has to be a brief hearing about a bond reduction or a bond modification and this is all up to the District Court Judge.

. . . .

'Hopefully [*sic*] will have you out shortly after you read this brief letter. I'll be in touch shortly.'

"24.     The respondent then sent a letter to T.C. by email. When the respondent sent the letter to T.C., he attached a copy of the letter he had faxed to H.S. In the respondent's letter to T.C., he said, in part:

'Dear [T.C.]:

'I had a nice visit with [H.S.]. I also gave her mom a call to let her know what's going on. I should know very shortly some more details regarding the bond and some details regarding the first appearance etc. I am also enclosing a copy of a letter I sent over to her so she would have something to look at if friends or family called and asked who the attorney was so I prepared this brief letter going over very superficially what is going on in the case without getting into any kind of detail. I certainly did not go into any details over the phone as I will not do that. The state would never try to admit a phone call between a client in [*sic*] an attorney into evidence, however, I don't go over details unless I'm there in person.

. . . .

'I am also enclosing a copy of the contract. Let's touch base tomorrow about the initial $10,000 payment on the retainer.

'I have also written the County attorney letting them know that I would be representing you in case there's [*sic*] any questions that they have of you. I don't know what she may have advised them about your knowledge of the accident or not, but that's what I need to visit with her in person about. She does know not to talk unless I'm there and only if it's something that we have talked about and made a decision about.

'You are smart in getting this done quickly as nothing is more important than hiring an expert as soon as an event like this occurs. I do appreciate your confidence in my office and I look forward to working with you and [H.S.].'

The respondent also spoke with H.S.'s mother, K.S., that day regarding H.S.'s case.

"25.    Sometime before 5 p.m. on July 23, 2015, the court entered an order setting bond at $50,000. Later that evening T.C. found out bond had been set. T.C. had gathered $10,000 in cash for the respondent's retainer and/or the bond. T.C. gave the cash to K.S. K.S. used $5,000 for the surety bond and H.S. was released on bond around 10 p.m. on July 23, 2015. After being released from jail, H.S. called the respondent from her mother's cell phone.

"26.    One of the bond conditions required H.S. to report to the community corrections office at 10 a.m. the next morning, July 24, 2015. H.S. did not report to the community corrections office at 10 a.m., as required by her bond. After realizing that she missed the appointment, H.S. called the community corrections office and rescheduled the meeting for 1 p.m. However, the court had already issued a bench warrant after H.S. failed to report to the community corrections office. Officers from the sheriff's department arrested H.S. and took her back to jail.

"27.    The respondent requested a bond modification hearing before the court. The court granted the respondent's request and held a bond modification hearing at 3 p.m. The respondent appeared on behalf of H.S. by phone. The court denied the respondent's request to modify H.S.'s bond and she remained in jail.

6

"28.     The respondent sent a letter by email to T.C. that day. In that letter, the respondent told T.C., 'It is also my understanding that [the county attorney or assistant county attorney] may want to have contact with you which makes sense as you're the owner of the vehicle so they may have some questions about your whereabouts when that accident occurred.'

"29.     The respondent's brother, John Studtmann, was working as an assistant in the respondent's office during this time. On July 24, 2015, John called Crystalyn Oswald, the assistant county attorney, and talked with her about whether the county attorney wanted to speak with T.C. After that conversation, John sent an email to the respondent and to the respondent's other assistant, Araseli Hernandez, informing them of the conversation:

'The main detective on this case is Detective Brad Ricke, and he does wish to speak with [T.C.] Crystaline [*sic*] is going to just have him call our office to schedule a time to try and reach you, and then we can schedule an appointment if appropriate. He will call us on Monday to try to reach Mike and to see about getting something scheduled. Crystaline [*sic*] did tell me that they have some rather large concerns about [T.C.] and the things that they have heard so she wanted to make you aware that there could be a conflict in representations, but she would leave that up to you and let you talk to client [*sic*] and everyone first.'

"30.     As of Friday, July 24, 2015, the respondent had not met with H.S. in person. The respondent's phone records show that the respondent had spent approximately 10 minutes on the phone with H.S.

"31.     Despite his lack of contact with H.S. throughout the day on Friday, July 24, 2015, the respondent had telephone calls with H.S.'s parents, K.S. and P.S. The respondent did not obtain informed consent from either T.C. or H.S. to disclose information relating to the representation [to] H.S.'s parents.

7

"32.     On Monday morning, July 27, 2015, K.S. called the respondent's office and made an appointment to meet with the respondent the next day, July 28, 2015. The respondent's assistant, Ms. Hernandez, sent an interoffice email to the respondent and his brother documenting the conversation with K.S.:

'[K.S.] called this morning and made an apt. for tomorrow at 11:15 to meet with Mike, pay retainer and discuss her daughters [*sic*] case. She said she called MS cell phone this morning and left him a vm. She said she does not want to sign a bond for [H.S.] anymore. She doesn't feel like [H.S.] will follow through with what she is supposed to if bonded and she said that [H.S.] was very hateful towards her and her husband this past weekend and they just don't want to be responsible for her bond and wanted to discuss that further with Mike.'

"33.     Later, on July 27, 2015, the respondent called P.S. and visited with P.S. regarding the representation. The next day, Tuesday, July 28, 2015, the respondent met with K.S. in person and P.S. participated in the meeting by telephone.

"34.     During that meeting, K.S. gave the respondent $10,000; $5,000 came from T.C. and $5,000 came from P.S. On behalf of H.S., K.S. signed an agreement titled, 'Receipt of Minimum Initial Fee Payment and Agreement for Legal Representation.' The agreement erroneously stated that the retainer was paid by K.S. and P.S. The agreement was for the representation of H.S. only. The agreement contained no references to T.C. The respondent did not obtain H.S.'s informed consent to accept compensation from a third party for her representation.

"35.     During the meeting, the respondent discussed information relating to the representation of H.S. and T.C. with K.S. and P.S. K.S. told the respondent how upset H.S. was that the respondent had contact with K.S. The respondent did not obtain either H.S.['s] or T.C.'s informed consent to disclose information relating to the representation to K.S. and P.S. During the meeting with H.S.'s parents, and in prior telephone conversations with them, they provided the respondent with background information about H.S.'s previous addiction issues. The respondent told K.S. and P.S. that he was

8

going to make 'addiction' part of his plan in her representation. K.S. was concerned about that because H.S.'s addiction issue was years in the past and K.S. knew this was not what H.S. would want because her prior addiction issues had nothing to do with the current case.

"36.    Also during the July 28, 2015 meeting, it became apparent to K.S. that the respondent was focusing on the idea that T.C. may have been to blame for the situation and that H.S. was covering for him.

"37.    While the respondent was meeting with H.S.'s parents, Ms. Hernandez had a phone conversation with Detective Ricke. Ms. Hernandez sent the respondent an email documenting the conversation:

> 'Informed him that we have been waiting on the State to file charges so
> that a motion can be filed for [H.S.]. Once that is done, Mike will be
> traveling out to Ellis County and hope to coordinate something with him
> if needed at that time. Det. Ricke said that would work. . . . he will
> arrange his schedule as needed to talk to Mike when he goes to Hays. . . .
> he also wanted me to let you know if there is any evidence we want him
> to look into on [T.C.] or [H.S.]'s behalf he would be glad to do that and if
> either of them want to speak to him he will also make arrangements to
> make that happen.'

"38.    Later that afternoon, the respondent sent a letter to the Ellis County Attorney:

> 'I will be representing [H.S.] regarding charges resulting from the auto
> accident that occurred on July 18, 2015. I understand that this accident
> resulted in a fatality and I also understand that the occurrence is still
> under investigation.
>
> 'Detective Ricke had contacted my office asking for an opportunity to
> schedule a meeting with a person of interest by the name of [T.C.] I am

9

assisting [T.C.], at least temporarily, but have explained to the parties that a conflict of interest is likely to develop in this case.

'I will visit with [T.C.] regarding Detective Ricke's request and get back with him promptly. Please let me know if you have any questions or concerns and I would greatly appreciate it if you would advise me when charges are filed.'

"39.     The respondent had not 'explained to the parties that a conflict of interest is likely to develop in this case.' Further, the respondent did not obtain T.C.'s written informed consent to a limited scope representation. At the hearing on the formal complaint, the respondent testified as follows:

'Q.     So, is that what you had with [T.C.], was a limited scope representation?

'A.     Yes. When I sent that letter out stating that I'm representing him regarding not wanting to talk, yes.

'Q.     Which letter is that?

'A.     I didn't get to the letter. We didn't have time. I was discharged before a week had even taken place in this case.

'Q.     But you had informed consent to that limited scope of representation?

'A.     I had told him. I hadn't put it in writing, though, like I said.'

"40.     Because H.S. and T.C. were dissatisfied with the respondent's representation, on Wednesday, July 29, 2015, H.S. and T.C. each obtained new counsel to represent them. H.S. retained Kurt Kerns and T.C. retained Paul Oller.

10

"41.    After learning that H.S. and T.C. had each retained new counsel, the respondent sent H.S. a letter by fax that stated, in part:

'I've been told, just since finishing dictating this letter on Thursday afternoon, that the Sheriff called us and indicated that she [*sic*] you did not desire to talk to us any further, and this is because you have new counsel. I have now verified with Kurt Kerns' office, the [*sic*] he will be entering on your behalf and handling your case moving forward.

'Your mother had been in to pay part of the retainer this week and she had indicated how upset you were that I had contact with her. I want you to understand you are free to hire anyone you please and I wish you the very best of luck, but your mother simply came in to my office so I could actually be paid part of my retainer so I could continue to work on your case. I will take no further action on your case but I would appreciate just a written verification that you're no longer desiring my office to represent you.'

The respondent provided T.C. with a copy of the letter he sent to H.S.

"42.    The respondent's characterization of his meeting with K.S. was misleading. K.S. was not 'in to pay part of the retainer.' Rather, K.S. met with the respondent regarding H.S. and her case. The respondent's time records bear this out, 'Appointment with [K.S.] to go over case, and with client's brother [*sic*].'

"43.    That same day, July 30, 2015, the respondent sen[t] a letter to T.C. *via* email:

'My assistant Araseli spoke to you yesterday via phone and gave you an update on our contact with Detective Brad Ricke regarding the matter in Ellis County. Detective Ricke had been informed that I represent you and we would be coordinating a time to meet with him where we would both

11

be present. That was to be scheduled on the same day as [H.S.]'s bond hearing when I was planning to be present with her in Ellis County.

'As of a few minutes ago, my assistant John spoke to you on the phone and it is my understanding that you have retained separate legal counsel. I will take no further action on your case and this is to confirm that I am no longer representing you.'

"44.     Shortly after the respondent sent that email to T.C., P.S. called the respondent's office for an update on H.S.'s case. Ms. Hernandez told P.S. that H.S. had hired another attorney. Ms. Hernandez emailed P.S. a copy of the respondent's letter to H.S.

"45.     On July 31, 2015, the Ellis County Attorney charged H.S. with three felonies, including vehicular homicide. The Ellis County Attorney charged T.C. with two counts of felony obstruction.

"46.     After H.S. fired the respondent, in an email on July 30, 2015, P.S. asked for an accounting of the fee to date and a partial refund of the $10,000 retainer. Ms. Hernandez replied on July 31, 2015:  'A billing of Mr. Studtmann's time will be done and provided to you. Once that billing is done I believe that whatever is left on the retainer will be reimbursed.'

"47.     Over the next two months, K.S. and P.S. each contacted the respondent's office repeatedly for an itemized statement of services and a refund of unearned fees. They were told the respondent was not available. K.S. and P.S. left multiple messages. The respondent never returned the calls. By October 1, 2015, the respondent had not provided an itemized statement of services.

"48.     On October 1, 2015, K.S. and P.S. filed a complaint against the respondent with the disciplinary administrator's office. In November 2015, as part of his response to the complaint, the respondent provided the investigator with an itemized

12

statement of his time in representing H.S. and T.C. The statement showed a total of 38 hours for a total fee of $8,875.

"49.     The respondent submitted a check in the amount of $1,125 payable to K.S. to the investigator. The investigator returned the check to the respondent because he did not believe he had the power to resolve a fee dispute as part of his responsibility as an investigator.

"50.     Later in the investigation, on March 25, 2016, the respondent provided a detailed response to the complaint filed by K.S. and P.S. Additionally, the respondent submitted a revised invoice. In . . . his response, the respondent explained some changes he made to the invoice. The March 2016, statement showed a total of 33 hours for a total fee of $7,625; a reduction of $1,250.

"51.     The respondent's itemized billing shows that time was billed in minimum quarter-hour increments.

"52.     Additionally, the respondent addressed the conflict of interest issue:

'Next, I wanted to also address the question regarding any possible conflict of interest involving [T.C.] that were posed to me at our last meeting. My representation of [H.S.] was prior to any charges being filed [*sic*] She was being investigated regarding a traffic fatality that occurred in Ellis County, and I had initially been contactedy [*sic*] by her boyfriend, [T.C.].

'On July 23rd, 2016, [T.C.] was contacted by law enforcement and asked that I assist as he did not want to visit with them without the advice of counsel [*sic*] I did advise both of these parties at that time of a possible conflict of interest, and my intent with regard to this situation is evidenced in my letter to the Ellis County attorney on July 28th, 2016. In that letter, I stated that I was representing [T.C.], at least temporarily, but

13

that I had explained to the parties that a conflict of interest is likely to develop in this case.

'No charges had been filed against [T.C.] at the time he spoke with me about his contact with law enforcement, and I discussed this with his girlfriend [H.S.] [*sic*] I explained the conflict of interest to him and that it would be necessary for him to retain separate counsel. [T.C.] wanted to have someone initially visit with law enforcement as he would did [*sic*] not want to discuss anything with them directly. Both parties were requesting that I assist in this fashion at that time. I note that it would have been ideal to have had them both sign a document citing this potential conflict of interest, but one was not prepared and executed prior to my withdrawal from the case. I note that it was only about one week between the time I initially informed the county attorney that I was assisting [T.C.] regarding questions involving the accident, and the time I actually got out of the case.

'We did not schedule any meetings with the detective as both clients felt that this would not be the best way to proceed. I had agreed to assist on a very temporary basis when [T.C.] had no attorney and law enforcement was assisting [*sic*] upon contact [*sic*]

'I don't believe we had reached a point where there was a conflict of interest. Both parties agreed to all actions and we spent a lot of time going over what a conflict of interest is and both parties understood. [T.C.] had been picked up for questioning shortly after they requested my help in this case, and he also was able to bond out immediately. All of this took place in a series of phone conversations that occurred the weekend after I had became [*sic*] involved in this matter [*sic*] I do note that an attorney may represent multiple clients if he can adequately represent the interests of each and with full consent and full disclosure of any possible effect of such representation. My help on [T.C.]'s matter

14

was for the very limited purpose of contact with law enforcement as both parties felt this was in their best interests.'

"*Conclusions of Law*

"53.    On July 21, 2017, Ms. Hughes filed a formal complaint in this case. In the formal complaint Ms. Hughes alleged that the respondent violated KRPC 1.2 (scope of representation), KRPC 1.5 (fees), KRPC 1.6 (confidentiality of information), KRPC 1.7 (conflict of interest), KRPC 1.8 (conflict of interest), and KRPC 1.16 (declining or terminating representation).

"54.    Based upon the respondent's answer, the parties' stipulations, and the above findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.2, KRPC 1.5, KRPC 1.7, KRPC 1.8, and KRPC 1.16, as detailed below. The hearing panel, however, does not find clear and convincing evidence to support a violation of KRPC 1.6. The hearing panel does not find a violation of KRPC 1.6 because insufficient evidence was presented to establish that the respondent disclosed confidential information. Accordingly, the hearing panel dismisses the allegations that the respondent violated KRPC 1.6.

"KRPC 1.2

"55.    'A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent in writing.' KRPC 1.2(c). In his correspondence, the respondent indicated that his representation of T.C. was for a limited scope. The respondent, however, failed to obtain T.C.'s informed consent in writing. Further, the hearing panel concludes that limiting the scope of the respondent's representation in this case was not reasonable under the circumstances. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.2(c).

15

"KRPC 1.5

"56.     The next rule for the hearing panel to consider is whether or not the respondent charged an unreasonable fee. Nearly three months after the respondent's representation was concluded, the respondent provided an invoice to the investigator in this case. According to the response and [in]voice, he earned nearly $9,000 of the $10,000 paid. Approximately six months later, the respondent provided a second invoice which reflected a reduction of the fee in the amount of $1,250.

"57.     In determining whether the fee is reasonable, the hearing panel must look at eight factors:

'(1)     the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

'(2)     the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

'(3)     the fee customarily charged in the locality for similar legal services;

'(4)     the amount involved and the results obtained;

'(5)     the time limitations imposed by the client or by the circumstances;

'(6)     the nature and length of the professional relationship with the client;

'(7)     the experience, reputation, and ability of the lawyer or lawyers performing the services; and

16

'(8)      whether the fee is fixed or contingent.'

"58.      The hearing panel carefully reviewed the respondent's invoices provided in this case. Each of the respondents entries is in .25, .5, .75 or full hour increments. The hearing panel also carefully reviewed the respondent's correspondence, the court files, the respondent's telephone records, the respondent's notes. Finally, the hearing panel considered the parties stipulations and respondent's testimony on the subject.

"59.      The hearing panel concludes that charging a $20,000 fee to handle this case from beginning to end would not be unreasonable. However, those are not the facts before the hearing panel. The respondent charged $7,625 for preliminary work on this case which included writing a few letters, meeting with his client's mother and father, and appearing by telephone at a bond hearing during an eight-day period of time. During that eight-day period of time, the respondent did not meet with his client, H.S. The hearing panel concludes that $7,625 is not a reasonable fee for the services rendered and, as a result, concludes that the respondent violated KRPC 1.5.

"KRPC 1.7

'60.      KRPC 1.7 addresses conflicts of interest regarding current clients.

'(a)      Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1)      the representation of one client will be directly adverse to another client; or

(2)      there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client,

17

a former client or a third person or by a personal interest of the lawyer.

'(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.'

In this case, the representation of H.S. may very well have been directly adverse to T.C. Regardless, there was a substantial risk that the representation of T.C. would be materially limited by the respondent's responsibilities to H.S. Additionally, there was a substantial risk that the representation of H.S. would be materially limited by the respondent's responsibilities to T.C. Thus, in order for the respondent to represent both clients he was required to take certain steps. The respondent failed to take the steps required by KRPC 1.7(b). As such, the hearing panel concludes that the respondent violated KRPC 1.7(a).

"KRPC 1.8

"61. KRPC 1.8(f) prohibits attorneys from accepting compensation for representing a client from someone other than the client unless:

18

'(1)    the client gives informed consent;

'(2)    there is no interference with the lawyer's independence of
        professional judgment or with the client-lawyer relationship; and

'(3)    information relating to representation of a client is protected as
        required by Rule 1.6.'

While H.S. may have acquiesced in the decision to hire the respondent to represent her, H.S. did not specifically give the respondent informed consent to the payment of the respondent's fees by P.S. and T.C. Further, it appears there was interference [with] the independence of the respondent's professional judgment and with the client-lawyer relationship. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.8(f).

"KRPC 1.16

"62.    KRPC 1.16 requires lawyers to take certain steps to protect clients after the representation has been terminated. Specifically, KRPC 1.16(d) provides the requirement in this regard:

'Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.'

The respondent violated KRPC 1.16(d) when he failed to timely return the unearned fees. The hearing panel concludes that the respondent violated KRPC 1.16(d).

"63.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"64.    *Duty Violated*. The respondent violated his duty to his clients to refrain from engaging in conflicts of interest. Additionally, the respondent violated his duty to charge reasonable fees and refund unearned fees.

"65.    *Mental State*. The respondent knowingly violated his duties.

"66.    *Injury*. As a result of the respondent's misconduct, the respondent caused potential injury to his clients and the legal system.

"67.    *Aggravating and Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

    a.    Prior Disciplinary Offenses. The respondent has been previously disciplined on three occasions. First, in 1999, the respondent was informally admonished by the disciplinary administrator's office for having violated KRPC 1.3 (diligence) and KRPC 1.4 (communication). Next, in 2005, the disciplinary administrator informally admonished the respondent for having violated KRPC 1.5 (fees). Finally, [in] 2008, the respondent was informally admonished for violating KRPC 4.2 (communication with person represented by counsel) and KRPC 5.3 (responsibilities regarding nonlawyer assistance).

20

b.        Dishonest or Selfish Motive. The respondent charged his clients an unreasonable fee and failed to timely refund unearned fees. The hearing panel concludes that the respondent's misconduct regarding the fee was motivated by selfishness.

c.        Multiple Offenses. The respondent committed multiple rule violations. The respondent violated KRPC 1.2, KRPC 1.5, KRPC 1.7, KRPC 1.8, and KRPC 1.16. Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

d.        Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process. At the hearing on the formal complaint, on a number of occasions, the respondent's testimony was deceptive, inconsistent and misleading. By way of example, Ms. Hughes questioned the respondent regarding information he obtained from H.S.'s friend, C.:

. . . .

'Q.      Is it your position that you didn't share any confidential information with [K.S.] and [P.S.] on the 28th within the meaning of Rule 1.6 as confidential information?

'A.      Now, refresh my memory, but I had permission to visit with her mom and dad, and—but I didn't have enough confidential information. At least at that point in time I knew very little. The main purpose for them coming in was just to—they wanted to meet me. They wanted to ask questions. They wanted to tell me their concerns. I don't have any—my—and I listened to their concerns because they—at least I think it was [P.S.], it may have been [K.S.], also, both were visiting with their concerns that were much like the witness [C.] on Saturday, that she felt that

21

perhaps she was covering up for her boyfriend, and they were worried about that.

'Q.    When you heard that at that point in time on July 25th, did you feel that you had a conflict, then, in your limited scope representation of [T.C.]?

'A.    Well, like I said, the only thing that I would agree to—and I think as soon as I understood I had a—at least where I think we had enough information that it look liked he was involved in concealing that, I knew I could no longer have—make any information, like I testified to say no questions, please, at this time. I—this was the time for him to have counsel, because there's definitely a problem and there's more than meets the eye.

'Q.    Did you tell him right that day, the 25th, after you spoke with [C.]?

'A.    On the 25th did I tell him that?

'Q.    Did you tell [T.C.] you believe now there was a conflict?

'A.    Well, after visiting with that—don't recall visiting regarding that particular thing. That was—that was something that she felt. I didn't get from [C.], other than she was very concerned about [H.S.] and that [H.S.] could be doing this and—(pause.)

'Q.    So, you did or did not have a conflict when you heard that information from [C.] that she thought [H.S.] might be covering for [T.C.] by claiming that she was the driver? Yes or no, did you believe you had a conflict at that point when you heard that information?

22

'A.      I had no intention of representing him. I did represent that I didn't want him to talk to authorities. That's it. But I wasn't going to represent him on anything—any charging of anything on this case.

'Q.      As his attorney you don't think you had the obligation to tell him people were saying that?

'A.      I believe if a witness said something that they felt that this was odd, do I have an obligation, we may have actually visited about that when I visited him next. I can't remember offhand just that.'

The respondent's testimony [was] deceptive and misleading. The respondent did not answer the questions posed, he testified that he did not recall discussing the information received from C. with T.C. and then he testified that 'we may have actually visited about that.' The hearing panel is troubled by the respondent's attempt at deception through this testimony as demonstrated through one example.

      e.      <u>Vulnerability of Victim</u>. H.S. was vulnerable to the respondent's misconduct as she was incarcerated during most of the period of representation.

      f.      <u>Substantial Experience in the Practice of Law</u>. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1985. At the time of the misconduct, the respondent has been practicing law for approximately 30 years.

"68.      Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

a.     Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct. In 2015, when the respondent was representing H.S. and T.C., the respondent experienced personal difficulties, in that his wife was in poor health. Because the respondent's wife was in poor health and, as a result, he provided 'day-to-day' care for his wife. (Sadly, the respondent's wife passed away in 2017.)

b.     Timely Good Faith Effort to Make Restitution or to Rectify Consequences of Misconduct. During the investigation of this disciplinary complaint, the respondent provided a refund of unearned fees as calculated by the respondent.

c.     The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions. The respondent fully cooperated with the disciplinary process. Additionally, the respondent admitted many of the facts that gave rise to the violations.

d.     Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney. The respondent is an active and productive member of the bar of Wichita, Kansas. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by several letters received by the hearing panel.

e.     Remorse. At the hearing on this matter, the respondent expressed genuine remorse for having engaged in the misconduct.

f.     Remoteness of Prior Offenses. The discipline imposed in 1999 is remote in character and in time to the misconduct in this case. The discipline imposed in 2005 is remote in time but not in character to the misconduct in this case. And, the discipline imposed in 2008 is remote in character and in time to the misconduct in this case.

24

"69.    In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.32    Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.

'7.2    Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

"*Recommendation*

"70.    The disciplinary administrator recommended that the respondent's license be suspended for a period of 90 days. Further, the disciplinary administrator recommended that the respondent be required to refund the entire fee paid because (1) he should never have accepted the representation of both clients, (2) by accepting the representation of both clients, he mandated that they both had to hire new counsel, and (3) neither H.S. nor T.C. received anything of value.

"71.    While the respondent provided a plan of probation prior to the hearing, at the hearing his counsel argued that an informal admonition was the appropriate discipline to be imposed in this case. Even though counsel for the respondent did not ultimately request probation, the hearing panel is compelled to consider the respondent's initial request for probation.

"72.    Before a hearing panel may recommend that a respondent be placed on probation, the hearing panel must make findings detailed in Rule 211(g)(3). Rule 211(g)(3) provides:

'(3)     The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

(i)     the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least fourteen days prior to the hearing on the Formal Complaint;

(ii)    the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;

(iii)   the misconduct can be corrected by probation; and

(iv)    placing the Respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.'

In this case, the respondent failed to develop a workable, substantial, and detailed plan of probation. Further, while the respondent's plan of probation was mailed on October 18, 2017, the rule requires the respondent to have provided it to the disciplinary administrator and each member of the hearing panel at least 14 days prior to the hearing on the formal complaint. It is unclear whether the respondent complied with this requirement. The respondent failed to put the plan of probation into effect prior to the hearing of the formal complaint by complying with each of the terms and conditions of the proposed probation plan. It appears, that the misconduct in this case could be corrected by probation. Finally, placing the respondent on probation is not in the best interests of the legal profession and the citizens of the State of Kansas.

26

"73.     Based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be censured and the censure be published in the Kansas Reports. The hearing panel also recommends that:

      a.     the respondent refund the entire retainer amount of $10,000 (less any amounts previously refunded);

      b.     the respondent provide a copy of an appropriate engagement letter to the disciplinary administrator's office for consideration and approval and make all revisions required by the disciplinary administrator's office to insure that the respondent is properly handling retainers paid by his clients; and

      c.     the disciplinary administrator's auditor conduct an audit of the respondent's trust account.

"74.     Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2018 Kan. S. Ct. R. 251). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint to which he filed an answer and an amended answer. Respondent was also given adequate notice of the hearing before the panel and the hearing before this court. He filed no exceptions to the hearing panel's final hearing report. With no exceptions before us, the panel's findings of fact are deemed admitted. Supreme Court Rule 212(c), (d) (2018 Kan. S. Ct. R. 255). Furthermore, the evidence before the hearing panel establishes the charged misconduct in violation of KRPC 1.2(c) (2018 Kan. S. Ct. R. 290) (scope of representation); 1.5 (2018 Kan. S. Ct. R. 294) (fees); 1.7(a) (2018 Kan. S. Ct. R. 302) (conflict of interest); 1.8(f) (2018 Kan. S. Ct. R. 309) (accepting compensation for representation of client from one other than client); and 1.16(d) (2018 Kan. S. Ct. R. 333) (termination of representation) by clear and convincing evidence and supports the panel's conclusions of law. We therefore adopt the panel's findings and conclusions.

The only remaining issue before us is the appropriate discipline for respondent's violations. At the hearing before this court, at which the respondent appeared, the office of the Disciplinary Administrator recommended that the respondent serve a 90-day suspension from the practice of law. The Disciplinary Administrator advised that respondent had refunded the entire retainer amount of $10,000 and had provided a copy of a proposed engagement letter. The Disciplinary Administrator expressed his willingness to review the letter and advise the respondent regarding any proposed changes. Finally, the Disciplinary Administrator requested an order allowing his office to audit the respondent's trust account. The respondent expressed his belief that the hearing panel's recommendation of published censure was "in order." He orally indicated that he would work with the Disciplinary Administrator regarding an engagement letter, and he agreed to an audit of his trust account.

A majority of the court agrees the hearing panel's recommendation of published censure is the appropriate discipline. While the hearing panel's finding that the

28

respondent's testimony was deceptive and misleading suggests a more severe sanction might be warranted, the majority accords deference to the panel's judgment regarding respondent's credibility and to its assessment of whether that credibility determination warrants a suspension of respondent's license to practice law. A minority would impose the 90-day period of suspension recommended by the Disciplinary Administrator.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that MICHAEL J. STUDTMANN be and he is hereby disciplined by published censure in accordance with Supreme Court Rule 203(a)(3) (2018 Kan. S. Ct. R. 234).

IT IS FURTHER ORDERED that respondent shall make all of the Disciplinary Administrator's proposed revisions to respondent's proposed engagement letter and shall fully cooperate with an audit by the Disciplinary Administrator's office of respondent's trust account, which is hereby ordered.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

ROSEN, J., not participating.
PATRICK D. MCANANY, J., assigned.[1]

---

[1]**REPORTER'S NOTE:** Judge McAnany, of the Kansas Court of Appeals, was appointed to hear case No. 118,992 vice Justice Rosen under the authority vested in the Supreme Court by K.S.A. 20-3002(c).